UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION


UNITED STATES OF AMERICA,    )    CASE NO:  4:13-CR-00176-1
                          )
             Plaintiff,   )        CRIMINAL
                          )
     vs.               )      Plano, Texas
                          )
HABIBOOLA NIAMATALI,     )    Wednesday, July 20, 2016
                          )    (11:32 a.m. to 12:21 p.m.)
             Defendant.    )


HEARING ON MOTION FOR BILL OF PARTICULARS (DE #229)

HEARING ON MOTION FOR CONTINUANCE OF PRETRIAL CONFERENCE
AND TRIAL SCHEDULING (DE #247)


BEFORE THE HONORABLE DON D. BUSH,
UNITED STATES MAGISTRATE JUDGE


Appearances:          See Next Page

Court Reporter:      Recorded; Digital Recording

Deputy Clerk:        Toya McEwen

Transcriber:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES FOR:


Plaintiff:                    G. R. JACKSON, ESQ.
                              JOSHUA M. RUSS, ESQ.
                              Assistant United States Attorney
                              101 E. Park Blvd., Suite 500
                              Plano, TX 75074

Defendant:                    THOMAS W. MILLS, JR., ESQ.
                              NANCY KENNEDY, ESQ.
                              Mills & Williams
                              5910 N. Central Expressway
                              Premier Place, Suite 900
                              Dallas, TX 75206-5141

INDEX

| DEFENSE WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| HABIBOOLA NIAMATALI | 6 | 12 | 16/25 | |
| THOMAS W. MILLS, JR. | 30 | 31 | | |

| DEFENDANT'S EXHIBIT | RECEIVED |
|---|---|
| 1 | 20 |

<u>1        Plano, Texas; Wednesday, July 20, 2016; 11:32 a.m.</u>

2                            (Call to Order)

3              **THE COURT:**  4:13-cr-176, *United States of America*

4    *versus Niamatali*.

5              Mr. Jackson?

6              **MR. JACKSON:**  Good morning, your Honor.  Mr. Russ is

7    also here for the Government.

8              **THE COURT:**  Hi, Mr. Russ.

9              **MR. RUSS:**  Hello, your Honor.

10             **THE COURT:**  Mr. Mills?

11             **MR. MILLS:**  Good morning, your Honor.

12             **THE COURT:**  Good morning, sir.

13             **MR. MILLS:**  Tom Mills and Ms. Nancy Kennedy also

14   for --

15             **THE COURT:**  All right.  Ms. Kennedy.

16             **MR. MILLS:**  Would you just sit here for just a

17   second?

18             **THE COURT:**  All right.  Now, I've got two matters

19   here.  A hearing on a motion for bill of particulars; what's

20   that about, Mr. Mills?

21             **MR. MILLS:**  This has to -- this has basically been

22   resolved, is what it is about.

23             **THE COURT:**  Okay.  Then, I'm not going to hear that

24   matter.

25             **MR. MILLS:**  Yes, sir.

1          **THE COURT:**  All right.  Now I've got a motion to

2  continue the trial or pretrial conference, which will be the

3  trial, I think, Docket Number 247.

4          What are your reasons for asking for a continuance at

5  this time, Mr. Mills?

6          **MR. MILLS:**  The reasons have to do with

7  Dr. Niamatali's health and his ability to and my concerns for

8  his ability to withstand the trial.  There is since --

9          **THE COURT:**  Stop you there.  Is he ever going to be

10  able to have the ability to withstand, as you say, the trial?

11          **MR. MILLS:**  I don't know.  But I know he has a -- a

12  cardiac surgeon who wants to do either open-heart -- either

13  open-chest surgery or a stent on his heart, and he has been

14  having blood indicating, he believes, a recurrence of his

15  bladder cancer.

16          **THE COURT:**  Stent on the arteries, not the heart, but

17  go ahead.

18          **MR. MILLS:**  Oh, I apologize.  And, so, this Monday,

19  two days ago, when I met with him, I had personal concern for

20  him and encouraged him to go to his oncologist, who is out of

21  town, and his -- and I encouraged him to go to the emergency

22  room, actually, and he has declined.  I do have attached to my

23  motion the first paragraph, which is the most recent visit and

24  language from his cardiologist, and I would like and feel

25  necessary to ask Dr. Niamatali to testify and get that on the

1    record.  I did not do that last time, and I believe that I

2    erred in a few statements that I made to the Court, not on

3    purpose, of course, but about the medical situation, and I feel

4    it necessary to ask Dr. Niamatali, and he's certainly willing

5    to, to testify and let the Court and the prosecutor ask

6    questions if they desire.

7            **THE COURT:**  Well, whatever you think you need to do,

8    that's fine, sir.

9            **MR. MILLS:**  Then, I would like to call Dr. Niamatali

10   to be sworn in to testify at this point, please.  I believe --

11   do you want him to go up -- up there?

12       **(Pause)**

13           **THE CLERK:**  If you'll raise your right hand, please.

14             **HABIBOOLA NIAMATALI, DEFENDANT, SWORN**

15           **THE COURT:**  All right.  If you'll have a seat,

16   please.

17       **(Pause; voices and whispers off the record)**

18                       **DIRECT EXAMINATION**

19   BY MR. MILLS:

20   Q    Would you please state your name and spell your name for

21   the court reporter, please, your first and last names.

22   A    I'm Habiboola Niamatali.  H-A-B-I-B-O-O-L-A; second name

23   N-I-A-M-A-T-A-L-I.

24   Q    All right.  How old are you?

25   A    I am 75 plus.

1    Q    And are you a medical doctor properly licensed in the

2    State of Texas?

3    A    Yes, sir.

4    Q    Okay.  During your investigation you do not write any

5    controlled substances prescriptions, correct?

6    A    Not for the last five years, sir.

7    Q    All right, sir.  This past Monday I discussed with you the

8    status of your health, and you -- I would like to ask you some

9    questions about that.  You have prostate, bladder, and bone

10   cancer at this time, do you not?

11   A    Yes, sir.

12   Q    And since I -- so I won't use the wrong terminology, would

13   describe what is your -- the situation with your heart blockage

14   or an artery blockage?

15   A    Yes.  I have the right coronary artery, which is the

16   second most important vessel in the heart, already with three

17   stents, and great doubt as to whether a fourth stent could be

18   applied there.  My left main coronary artery has an obstruction

19   that needs to be fixed.  The obstruction is such that I am able

20   to walk short distances; I cannot exercise --

21          THE COURT:  Okay.  Let me ask you --

22          THE WITNESS:  -- I can drive a car, but --

23          THE COURT:  Doctor, let me ask you a question.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  You said your left artery.  Are you

1    talking about your left anterior descending or your circumflex?

2           **THE WITNESS:**  No, sir.  Just beyond the circumflex,

3    the left coronary artery has an obstruction.  The fear is that

4    if they put in a stent in that left main coronary it may steal

5    blood from the one functioning good artery, the circumflex.  As

6    such, there is doubt as to whether I would survive putting in a

7    stent there, and they are pushing to have an open-heart

8    operation, a bypass.  The problem that we have within the

9    extended family is that members of the family have had

10   ventricular fibrillation when you mess with the -- that main

11   artery.  I could die sudden death from surgery, from stenting,

12   or sudden stress.  I have already -- you already know something

13   of the sudden stress the night before we last met when -- when

14   my wife was in a state of extreme dismay --

15          **THE COURT:**  Okay.  Let's go on with your immediate

16   problems, then.  So, you talked about your artery.  What else?

17          **THE WITNESS:**  I'm sorry, sir?

18          **THE COURT:**  You've talked about your artery; now,

19   what else?

20          **MR. MILLS:**  Well, if -- may I --

21          **THE COURT:**  Yeah, go ahead.

22          **MR. MILLS:**  -- please?

23   **BY MR. MILLS:**

24   Q    If the trial does not happen, say, on Monday or

25   immediately thereafter, what then is your plan for trying to

1   fix that?

2   A    My -- my plan is I would like to take up this fight on the

3   first of January, 2017, and give it all that I've got.  I will

4   make myself ready regardless of my condition, go fight what I

5   am charged with --

6   Q    I understand.  But what would your next plan be to help

7   your heart so that you're ready for trial?

8   A    One is -- the first thing is that I -- the cardiologist

9   has demanded that I have 24-hour holter monitoring, which I

10  think he plans to do as soon as I -- as I am available for it,

11  and he will then decide whether I am ready -- I have to have a

12  pacemaker first or not.  My heart rate goes down to 42, and if

13  it gets lower, I tend to faint.

14  Q    And have you had fainting spells?

15  A    At least two spells, sir.

16  Q    All right.  And is -- is -- all right.  Now, let me ask

17  you about the situation with blood in your urine as it relates

18  to your bladder cancer.  You have not seen the oncologist about

19  that, correct, because he's out of town?

20  A    He's out of town.  The plan is that -- it looks as if the

21  damn thing -- it looks as if the thing has recurred, and their

22  intention was to remove the complete bladder together with the

23  prostate.  The feeling though is that I was not -- in the state

24  of my heart I should not be subjecting myself to that, so that

25  you had to fix the heart first.  But there is a danger.  Having

1  fixed my heart, that would require to be anticoagulated.  If

2  I'm anticoagulated, they do not relish the idea of operating on

3  my prostate and bladder, removing it.

4  Q    Because why?

5  A    Because I may bleed to death.  Just the last time that

6  they biopsied my prostate.

7  Q    What happened then?

8  A    I lost three pints, sir, and that was the third time that

9  I collapsed.

10 Q    Three pints of blood?

11 A    Yes, sir.

12 Q    All right.  I think earlier, or a few minutes ago, I used

13 the term "oncologist" instead of "urologist."  Is that the term

14 I should be using, the specialty?

15 A    Yes.  It's the onco- -- the urologist looks after my

16 bladder at the present time.  The oncologist looks after the

17 bone cancer.

18 Q    All right.  Have you been told to have treatment or an

19 examination now, whether you want to or not, regarding the

20 status of the bladder?

21 A    I have not met with the urologist as yet.  The plan is

22 next week -- possibly before next week --

23 Q    Well, it would have to be if there is a trial next week.

24 A    I have to get an ultrasound to see whether it is a

25 recurrence of the bladder cancer or it's something else;

1  whether I have developed a blockage in the right ureter, in

2  which case they have to proceed to surgery.  I have to wait

3  until I do that.  He's got to request it; I can't request it

4  myself.  And then they will fix that, do what has to be done.

5  But, sir, I'm relishing in a kind of a way this fight that has

6  to come.

7  Q    I understand.  But do you understand my concern that you

8  be able to assist me in defending you in terms of your health

9  condition?

10 A    Yes, sir.  I appreciate it.

11        **MR. MILLS:**  Yes, sir.

12        Judge, I think that I would be requesting something

13 as -- something like a 30-day continuance so that he can have

14 some of this testing done to see if surgery is required, to see

15 if a stent is required, to see if the open-heart surgery is

16 required.  I don't feel that he is -- and -- and I don't feel

17 like a longer continuance should be, but I am very concerned

18 about his ability to assist himself and me.  I would like to

19 pass the witness for questions from either the Court or the

20 prosecutor.

21        **THE COURT:**  All right.  Mr. Jackson?

22        **MR. JACKSON:**  Thank you, your Honor.

23 //

24 //

25 //

1                    **CROSS EXAMINATION**

2    **BY MR. JACKSON:**

3    Q    Dr. Niamatali, these medical conditions you have described

4    have not kept you from treating people who have come to your

5    clinic for the last five years, have they?

6    A    No, sir.  They are not --

7    Q    Okay.

8    A    That is not stressful.

9    Q    And they haven't kept you from driving a car to work and

10   home every day during those five years.

11   A    No, sir.  No, sir.  No exercise is really required --

12   Q    And they haven't --

13   A    -- to drive a car.

14   Q    -- kept you from coming to court when you've needed to,

15   have they?

16   A    Correct.

17   Q    And they haven't kept --

18   A    But I have --

19   Q    I apologize.  Continue your answer.

20   A    Yes.  I am able to come to court, but in walking from my

21   car to here, I have to stop twice:  one to take off my belt and

22   so on, and then from there to here I have to stop twice or slow

23   down.  I do have the capacity to do some things.

24   Q    And you have the capacity to testify here in court here

25   today, correct?

1   A     Yes.

2   Q     In fact, you are presenting testimony right now.  You

3   understand you're under oath, correct?

4   A     Correct.

5   Q     You understand everything you need to tell the Court right

6   now needs to be true, correct?

7   A     Provided it is not stressful, no problem.

8   Q     So, are you saying if the question is stressful or if

9   you're under stress you do not have to tell the truth?

10  A     I will always tell the truth, sir.  You know that very

11  well.

12  Q     Well, your last answer wasn't clear.  So, you understand

13  you have to tell the truth under oath.

14  A     Of course.

15  Q     Okay.  And you stated a few moments ago that you have not

16  written a prescription for a controlled substance in the last

17  five years.  You recall saying that, right?

18  A     Correct, sir.

19  Q     And that is a true statement.

20  A     Yes.

21  Q     Okay.  You want to put your trial off until January?  Is

22  that what you're asking the Court?

23  A     Possible.

24  Q     Okay.  And explain to me why January you will be ready.

25  A     On 31st of December I will have completed 50 years as a

 1  doctor.

 2  Q    So, this continuance is so you can get to 50 years as a

 3  doctor?

 4  A    No.

 5  Q    So, it has nothing to do with your health?

 6  A    No.

 7  Q    Okay.

 8  A    No.

 9  Q    Then, why did you just say on December 31st you will

10  reach --

11  A    Ask the question --

12  Q    -- 50 years as a doctor?

13  A    -- for which you need the full answer.  You interrupted

14  the answer, sir.  May I --

15  Q    Oh, please continue.  I didn't mean to interrupt you.

16  A    Yes.  It was a desire that I would complete 50 years as a

17  physician.  I am now 49.7 or a little bit more than that.  I

18  really want to do that five months, after which I will take on

19  all (indiscernible) including whatever you bring up; that's

20  one.

21           The second thing is, being aware that under stress I

22  sweat, I feel faint, I collapse, I would like to get myself

23  ready for that eventuality, that in the event that I conk out I

24  will have completed the things that I would like to do in the

25  next five months.  One, fix my heart and my bladder and my

1    prostate.  Find out why it is that I've lost so much weight.  I

2    will continue to take the care, the treatment for the bone

3    cancer.

4          And the other things are very major things which I

5    set as objectives in my life.  One, the DEA knows that I have

6    been working in energy for 60 years, and I believe that I can

7    provide an energy source that really has not been tapped in the

8    world; an energy source such that, in addition to air, water,

9    and food, if we have an energy source, we can achieve a lot.

10   It is for all mankind.  It's not for America alone.

11         The second thing is, I do believe that it is possible

12   that I should -- that should I be allowed to sow the seeds of

13   something that I will describe, that in the process of time it

14   will bring back enormous fruit.  I feel that it is possible to

15   unite mankind in many different ways.  But in terms of

16   religion, which divides mankind now, it is possible to unify

17   it.  I have spent -- unite mankind.  I have spent 50-odd years

18   working on this, and I need to at least sow the seeds before I

19   die.

20   Q    Okay.  Are you finished?

21   A    Yes.

22   Q    Okay.  So, if I'm understanding correctly, you need a

23   continuance of your trial to January 1st for --

24   A    Yes.

25   Q    -- four reasons:  first, so you can reach 50 years of

1   practicing medicine; second, so you can fix your heart and the

2   rest of your health problems; third, so you can supply an

3   energy source to the world that will help us with our energy

4   problems; and, fourth, that you can unite mankind and -- from

5   the divisions that religion has caused.  Did I state that -- is

6   that summary correct?

7   A    That's a fair interpretation of what I've said.

8            **MR. JACKSON:**  Okay.  Thank you.

9            **THE COURT:**  Mr. Mills?

10           **MR. MILLS:**  Yes, your Honor.

11                      **REDIRECT EXAMINATION**

12  **BY MR. MILLS:**

13  Q    Dr. Niamatali, several years less than five years ago,

14  three years maybe approximately, was when you got -- lost the

15  right to subscribe or prescribe controlled substances, and yet

16  you've said several times under oath that it was five years.

17  Will you think back?  Because it wasn't five years, was it,

18  Dr. Niamatali?

19  A    Let me explain, sir, and then perhaps we will arrive at

20  the truth.

21  Q    All right.

22  A    The moment the DEA came in to me, the night before my

23  first operation, 15th of June, 2011, they requested that I

24  cease writing those substances.  I immediately did that.

25  That's 15th of June, 2011.  Now, this is five years from then.

1    The charge against me was brought after it was determined that

2    I was closed, that -- that it was desired that I should close

3    my office and disappear, and I saw absolutely no justification

4    for that.  The DEA was very disturbed that they had removed

5    maybe 2,000 charts and they could not understand why it is that

6    I was still practicing.  And it was pointed out to them that I

7    have 15,000 charts that have nothing to do with what they --

8    what they brought against me.  And those 15,000 charts that are

9    there, they are patients that I've seen for the last five

10   years, and I'm seeing more now than I saw in the years when

11   the DEA was --

12   Q    All right.

13   A    -- (indiscernible).

14   Q    So, it is your belief that that's when you stopped on --

15   A    Yes, sir.

16   Q    -- writing the prescriptions for controlled substances.

17   A    Yes.

18   Q    Let me ask you this.  You and I have discussed the fact

19   that I am concerned, when we talk, that you are not able to

20   assist me because of your memory lapses and health problems.

21   Isn't that true?

22   A    Yes, sir.

23   Q    Do you understand that you need to be at some better level

24   of health to be tried and defend yourself the best way that you

25   can?

1   A    Yes, sir.

2   Q    All right.  These other things about world religion and

3   energy I totally understand, and your desire to reach 50 years;

4   I totally understand the importance you place on that.  I'm

5   focusing on your medical situation.  Do you understand?

6   A    Yes, sir.

7   Q    Okay.  You do have -- had -- you have had the ability to

8   drive yourself to your office, see some patients, take naps in

9   both the morning and the afternoon, correct?

10  A    Yes, sir.

11  Q    Your wife drove you here today, correct?

12  A    Yes, sir.

13  Q    She drove you; dropped you off; she will drive you home.

14  A    Yes, sir.

15  Q    Okay.  It's not as though you don't have short-term

16  ability to talk and communicate, correct?

17  A    Yes, sir.

18  Q    The weight loss; you've lost almost 50 pounds in the last

19  six months, have you not?

20  A    Yes, sir.

21              **THE COURT:**  How much?

22              **THE WITNESS:**  Fifty now.

23          **MR. MILLS:**  Fifty.

24              **THE COURT:**  Fifty?

25          **MR. MILLS:**  Yes, sir.

1          **THE COURT:**  Fifty pounds.

2          **THE WITNESS:**  Yes, sir.

3          **THE COURT:**  Well, his doctor says 17.

4          **MR. MILLS:**  On what date, your Honor?

5          **THE COURT:**  Well, I'm looking at 7/18 of 2016, just a

6    couple days ago.

7    **BY MR. MILLS:**

8    Q     Do you know why your doctor would say 17 if you say it was

9    50?

10          **THE COURT:**  And seven pounds of that's getting off

11   Crestor, according to the doctor; I don't know.

12          **MR. MILLS:**  Well, I'm looking at the record.  It

13   looks like on June 20 -- June 2nd, that he said he has 17

14   pounds of weight loss.

15   **BY MR. MILLS:**

16   Q     In any case, how much weight loss do you think you've had?

17   A     Sir, I was 234, and I think that I am now down to about

18   184.

19   Q     All right.

20   A     Give or take a couple of pounds.

21          **MR. MILLS:**  All right.  I don't think I have any

22   other questions.

23          **THE COURT:**  Okay.

24          All right.  You can step down, sir.  Thank you.

25       **(Witness stepped down)**

1          **MR. MILLS:** I don't have any other testimony to

2    offer.

3          **THE COURT:** All right, sir.

4          Well, the only -- are you going to offer this --

5          **MR. MILLS:** Oh, I'm sorry. I would like to offer

6    the -- the medical records that's attached to my motion for

7    continuance as Defendant's Exhibit 1 for the purposes of this

8    hearing. I will hand a copy to the appropriate person.

9          **THE COURT:** Any objections to this from the

10   appropriate person? Mr. Jackson?

11         **MR. JACKSON:** I'm not sure I'm the appropriate

12   person, your Honor, but I have no objections.

13         **THE COURT:** Well, I thought he was going to give it

14   to you and let you see it.

15         **MR. JACKSON:** I believe he provide --

16         **THE COURT:** Oh.

17         **MR. JACKSON:** Mr. Mills has provided --

18         **THE COURT:** He's already given that to you. Okay.

19      **(Defendant's Exhibit Number 1 was received in evidence)**

20         **MR. JACKSON:** -- this to us before the hearing.

21         **THE COURT:** All right. Well, all right, sir.

22         Now, I've just heard his testimony. I just note the

23   only record I have in front of me is from Dr. -- looks like

24   Shaw?

25         **MR. MILLS:** Yes, your Honor.

1           **THE COURT:**  And this is dated, as far as I can tell,

2   7/18/2016.  What's today?  Twenty -- what's today?

3           **THE CLERK:**  Twentieth, your Honor.

4           **THE COURT:**  Okay.  Two days ago.  He was there two

5   days ago is what you're saying?

6           **MR. MILLS:**  To my knowledge.

7           **THE COURT:**  Okay.  Well, I mean, just follow along

8   with me, and then help me out with this, Mr. Mills.  First of

9   all, he denies any chest pain.  There is a statement by the

10  doctor in there that there is no chest pain.  He has a history

11  of sinus -- of bradycardia and a sinus first degree AV block.

12  I note that there is no notation of symptomatic bradycardia;

13  it's just bradycardia.  I mean, every -- millions of people

14  have bradycardia.  Particularly, if you're a well-conditioned

15  athlete, you're going to have bradycardia for purposes.

16          First-degree AV block with normal sinus rhythm?

17  Nothing there flagging my attention.  A lot of people have

18  that.

19          He says that he has 17 pounds of weight loss.  I

20  don't know over what period of time.

21          He's been experiencing symptoms of exertional dyspnea

22  for the last three years.  Well, that's the last three years

23  he's had shortness of breath.  That he -- the doctor says he

24  denies any near-syncope episodes or extreme lightheadedness,

25  which would be indicative of some sort of a, you might think,

1  of a heart problem, but he denies any syncope or

2  lightheadedness.

3         **MR. MILLS:**  Well, he said that he --

4         **THE COURT:**  Well, let me finish.  I'm trying to read

5  through this and trying to get an idea of what we're dealing

6  with here.

7         On 7/18/2006 (sic) they do a -- a EKG or ECG on him.

8  They note sinus bradycardia with a heartbeat of 55 beats a

9  minute.  He's got an AV block, but, like I said, that's nothing

10 that jumps out at me there.  A lot of people live with AV

11 blocks normally for all their life.  I think the doctor would

12 agree with that.

13        There is a notation of lateral T-wave inversion.  A

14 little more prominent compared to the previous EKG.  I don't

15 know if they're looking at B-5 and B-6 there on the leads, but

16 probably that's where they're looking; he's got some T-wave

17 inversion.  This is in 2016.  He had noted lateral ischemia in

18 2001, 15 years before.  So, he's got some ischemia.  The

19 heart's not getting enough oxygen in the lateral area.  But

20 it's been that way for over 15 years on these studies.

21        Like I said, the report in 2001 shows an area of

22 ischemia in the lateral area; it's still showing a lateral T-

23 wave inversion, but 15 years ago he had that.  I mean, there is

24 nothing that I can see from the doctor's report that's changed

25 over the years in this man's health.

1          **MR. MILLS:** Well, other than that fact that --

2          **THE COURT:** Now, I'm not saying he doesn't have heart

3    problems.

4          **MR. MILLS:** Or three kinds of cancer that affect

5    other parts of his body, your Honor.

6          **THE COURT:** Well, I -- you know, I heard about that,

7    I think last time. He said --

8          **MR. MILLS:** You did.

9          **THE COURT:** -- he had, at least in seven, but he

10   hadn't gone in to have any surgery done on that. And I don't

11   remember if he told me it was three four or four three, but --

12   now, the -- if you want, I'll have probation take and run a

13   urine sample on him right now. Let's see if he's got

14   hematuria.

15         **MR. MILLS:** And may well. It doesn't matter. It's

16   fine with me, but I'd also like to ask him to testify again and

17   respond to your medical --

18         **THE COURT:** I'm just --

19         **MR. MILLS:** -- observations.

20         **THE COURT:** I'm not -- I'm just making observations

21   from the EKG report.

22         **MR. MILLS:** Judge, you're making medical observations

23   and conclusions.

24         **THE COURT:** I'm not making conclusions. I'm saying

25   what the reports say. It shows lateral ischemia in 2001; it

1  shows lateral ischemia in 2016.

2        **MR. MILLS:**  And you're deciding on the meaning of

3  that in order to make a -- in order to see whether or not to

4  grant a continuance of the man who has an -- and maybe I should

5  testify -- who has a hard time sitting through meetings with

6  counsel, who hasn't been breaking the law in the last three

7  years during the pendency of this case, who's 75 years old, and

8  has -- and his cancer is not in remission, which is in writing

9  here, and then he has to be put to trial on Monday.  And I just

10  feel like that it's depriving him of his right to effective

11  assistance of counsel, because he's not going to be physically

12  effective.

13        I would like to ask him to testify and respond to

14  some of your --

15        **THE COURT:**  Well, my observations; I'm not making --

16  I'm not a doctor.  I don't make medical opinions or

17  conclusions.  I'm just reading from the report, what it says in

18  the report.

19        **MR. MILLS:**  But you're saying what they mean.

20        **THE COURT:**  Well, I said, yes, it says lateral

21  ischemia, and the other one says lateral ischemia.

22        **MR. MILLS:**  I would like to ask him to testify to

23  respond to your --

24        **THE COURT:**  Okay.  Whatever you want to ask him to

25  do.

1          **MR. MILLS:**  All right.

2          **THE COURT:**  Ask him what ischemia means.

3          **MR. JACKSON:**  May I have a moment to speak with

4    counsel, your Honor?

5          **THE COURT:**  Yeah.

6      **(Pause; counsel conferred off the record)**

7          **MR. MILLS:**  Okay.  Would you go back up there,

8    please?

9          **THE COURT:**  He can --

10         **MR. MILLS:**  You're still under oath.

11         **THE COURT:**  He can do it from right there --

12         **MR. MILLS:**  Oh.

13         **THE COURT:**  -- if it's brief.  Just stay right there,

14   Doctor.

15         **MR. MILLS:**  All right.

16         **THE COURT:**  You can just ask him; if you have any

17   questions about what ischemia means or anything like that.

18                   **FURTHER REDIRECT EXAMINATION**

19   **BY MR. MILLS:**

20   Q    Would you respond -- he is asking if you want to respond

21   about ischemia, but I also want you to respond to his other

22   statements, please.

23   A    Yes.  Sir, ischemia simply means that the oxygen supply to

24   the muscle of the heart is impaired.

25         **THE COURT:**  Yes.

1          **THE WITNESS:**  It means --

2          **THE COURT:**  That's what I said, noted, yes, sir.

3          **THE WITNESS:**  Yes.  It doesn't mean injury; it does

4    not mean death of muscle.  It's just --

5          **THE COURT:**  I understand.

6          **THE WITNESS:**  (indiscernible).

7          **THE COURT:**  And I think that I made -- you heard me

8    say that, just --

9          **THE WITNESS:**  Yes, sir.

10         **THE COURT:**  -- impaired oxygen.  So, okay.  What

11   else?

12         **THE WITNESS:**  Okay.  My concern is really that on the

13   last time we discussed this -- or you discussed this problem,

14   you correctly identified that if I did not take nitroglycerin

15   that it would suggest that I'm managing fairly well.  Two, that

16   if I did not have evidence of heart failure -- swollen ankles,

17   shortness of breath, or fluid filling up the lungs -- that I am

18   managing fairly well.  My only concern, and the cardiologist's

19   concern, were these episodes in which I collapsed.  I have told

20   you of two episodes, and today we were reminded of a third.

21         **THE COURT:**  Okay.  Where -- where --

22         **THE WITNESS:**  And on this stress --

23         **THE COURT:**  Where is it in -- where -- sir, I'm

24   sorry.  Where is it in the report from a cardiologist that

25   you've collapsed?  Because I didn't see that you collapsed.  It

1  said you denied syncope, you denied lightheadedness.  So, I

2  didn't see where you had, as you say -- the cardiologist did

3  not report -- at least I didn't read it -- you collapsing.

4          **THE WITNESS:**  Sir, it states on the fifth line of

5  the -- one, two, three, four, five -- that "He has experienced

6  near syncopal episodes since his last visit."

7          **THE COURT:**  Yes, sir.  "Near."

8          **THE WITNESS:**  And is --

9          **THE COURT:**  Now, okay, doctor.  "Near syncopal" --

10 "syncope episode."  Did she say -- or is this doctor a "she" or

11 "he"?  I'm not sure (indiscernible).  Did the doctor say you

12 experienced -- did you tell her you experienced a syncope

13 episode or a near-syncope episode?

14         **THE WITNESS:**  I told them the following, sir.  That

15 under the battering that I was receiving that night,

16 thankfully, I fainted.  I fell asleep and woke up and was still

17 faced with that battering.  I was sweating all over.  We did

18 not discuss it any further.  But I think that in the

19 circumstance -- and I thought I lost consciousness or fell

20 asleep.  But then it happened again.  I usually play it down,

21 because if I play it up, there's going to be further panic and

22 further problems.  I just wanted to continue to get ready for

23 my fight.

24         **THE COURT:**  Okay.  How long have you had the

25 diagnosis of the AV block -- first-degree AV block?

1          **THE WITNESS:**  Sir, I can't correctly answer, but I

2    believe that when my heart slows down to 42 all sorts of bad

3    things happen.

4          **THE COURT:**  No, I didn't -- no.  Do you know how long

5    you've had the diagnosis of the first-degree AV block?

6          **THE WITNESS:**  Um --

7          **THE COURT:**  (indiscernible)?

8          **THE WITNESS:**  No, sir.  I have not -- it's not --

9    it's a benign condition.  I  haven't worried about it, and I

10   can't say when it is.

11         **THE COURT:**  Okay.  And what I said about --

12         **THE WITNESS:**  But it's --

13         **THE COURT:**  The observations I made about many people

14   having AV block, first degree, many people live normally with

15   that and have no problem.

16         **THE WITNESS:**  I wouldn't worry about it.  However, I

17   have the condition in which there is the occasional dropped

18   beat.

19         **THE COURT:**  Okay.  You say you -- you have a -- is it

20   what they would call a "PAC," a "PJC," or a "PVC"?

21         **THE WITNESS:**  No; none of those, sir.  I don't know

22   the -- I know PVC, but the PAC?

23         **THE COURT:**  You have a dropped beat?

24         **THE WITNESS:**  With which the (indiscernible) does not

25   -- when it makes a contraction or a spike, a ventricular spike

1  should automatically follow it.

2            **THE COURT:**  Okay.

3            **THE WITNESS:**  If the ventricular spike doesn't follow

4  it, then that's just the one that they're worried about.  The

5  question is whether I should have a pacemaker before proceeding

6  to any other thing.  They have a question that they do a 24-

7  hour holter monitor before they make the decision about that.

8  The real thing is that -- is whether I could be stressed, and

9  then, in the midst of that 24-hour holter monitor, to see what

10 it triggers.

11           **THE COURT:**  Where you could be stressed; are you

12 talking about having a stress test?  Is that what they're

13 talking about?

14           **THE WITNESS:**  No, sir.

15           **THE COURT:**  You said "be stressed"?

16           **THE WITNESS:**  If I am stressed.  What happens is that

17 under stress I am aware that two things happen.  I feel my

18 heart thumping or stopping.  It is that stress that they wanted

19 to see what this is really all about.

20           **THE COURT:**  Okay.  Well --

21           **MR. MILLS:**  If there are no more questions of him, I

22 would like to testify.

23           **THE COURT:**  All right, sir.  You're an officer of the

24 Court.  You need not be sworn in.

25           **MR. MILLS:**  Thank you.

1          **THE COURT:**  You may proceed.

2          **MR. MILLS:**  Thank you.

3          **THE COURT:**  Do you want to do it in a narrative --

4          **MR. MILLS:**  So --

5          **THE COURT:**  -- or do you want to ask yourself a

6    question and give an answer?

7          **MR. MILLS:**  If you don't mind; well, can I do it --

8    I'll do it in narrative and try not to abuse it.

9          **THE COURT:**  All right.

10    **DIRECT EXAMINATION OF THOMAS W. MILLS, JR - VIA NARRATIVE**

11         **MR. MILLS:**  My name is Thomas W. Mills, Jr.  I have

12   been licensed in the State of Texas since September of 1972.

13   I'm board certified by the State and nationally in criminal

14   law.  My practice has been 95 percent involved in criminal law

15   defense for 40 plus years.

16         I have represented Dr. Niamatali for a year or more;

17   I don't remember exactly how long.  But recently, in preparing

18   for this trial, in a way that conversations with the prosecutor

19   and the courts made it appear that it was going to go to trial,

20   I have been trying to work more with Dr. Niamatali in my

21   office.  He, in -- in going over documents and in questioning

22   him, he has periods where he lapses into a state where he's --

23   he doesn't faint, he doesn't fall out of his chair, but he

24   simply goes into a state where he does -- isn't being -- I

25   can't communicate with him.  He has significant memory lapses,

1  which are very difficult in terms of preparing for trial,

2  because it requires going over these charts with patients.

3          I am aware of the concept of the constitutional right

4  to counsel and the right to have counsel be competent, and I do

5  not believe that I can competently represent him now because of

6  his physical condition that he manifests in my presence in my

7  office, with other people present at times.

8          **THE COURT:**  Are you saying that you don't think he's

9  competent to proceed for trial?

10          **MR. MILLS:**  I don't think he's physically competent,

11  and I think the physical -- to the extent that I know about

12  physical symptoms, I think that it does have a direct effect on

13  his mental status.  I don't think he's, like, just walking

14  around mentally incompetent or psychotic at all.  But he's not

15  able to help me prepare for his own trial.

16          I don't have any other statements.

17          **MR. JACKSON:**  Your Honor, may I ask Mr. Mills a

18  question?

19          **THE COURT:**  Mr. Jackson, you may ask any questions

20  you wish.

21          **MR. JACKSON:**  Any.  We'll confine it to this subject.

22                         **CROSS EXAMINATION**

23  BY MR. JACKSON:

24  Q    Mr. Mills, assuming Mr. Niamatali's physical and medical

25  condition remain the same, how much time would you need to

1   adequately prepare yourself to represent him for trial?

2   A     How did you start that out?  If --

3   Q     Assuming his current medical and physical condition stay

4   the same --

5   A     Same.

6   Q     -- or possibly get slightly worse, how much time do you

7   believe you need to competently represent him at trial?

8   A     Well, in terms of trial preparation, it's taking so long

9   to get through things, where he doesn't have a memory

10  recollection, I would think that it would take another 30 to 60

11  days.  If at that time he's the same or worse and he's still in

12  trial sitting by me and unable to participate mentally in the

13  trial, I -- I just don't know how I would -- how he would ever

14  be ready, unless he gets medical help that -- that helps him

15  and affects his mind.

16  Q     Okay.  And you've relayed this to him, correct?

17  A     To him?

18  Q     Yes.

19  A     Yes.

20  Q     And -- and he has not scheduled any medical appointments

21  as a result of that?

22  A     Well, I think that he did go to this doctor on Monday,

23  his -- his -- it was either his -- I think it's his urologist

24  is out of town until next week.  I encouraged him, because of

25  the blood in the urine and the bladder cancer, which he says

1   it's a symptom of, has been before -- I encouraged him to go to

2   the emergency room.

3   Q    But --

4   A    But he declined.

5   Q    -- he did not follow that advice.

6   A    He did not.

7           **MR. JACKSON:**  Okay.

8           **THE COURT:**  Mr. Mills, I don't have any affidavits

9   from any doctors, any psychologists, any psychiatrists, any --

10  any doctors saying that he's not fit to stand trial or that his

11  health does not permit him to do so.  I have nothing.  And I

12  don't see anything in the record -- and I think he agrees with

13  me; I don't think I've made any mention here of anything that

14  the doctor doesn't agree with me on.  It's just hard for me

15  to -- to understand how he cannot stand -- or cannot

16  participate in trial.  Everything I observe about him -- and

17  this is my observation -- he always seems very competent and

18  capable to answer questions here in court, has no problem with

19  that.  And that's just an observation.  I'm not a psychologist.

20  I'm just making an observation.  But I've been doing this a

21  long time, maybe too long, but --

22          **THE WITNESS:**  Myself.

23          **(Laughter)**

24          **THE COURT:**  But I don't have any -- I mean, if you

25  bring in a doctor's affidavit or something I could look at

1    and -- and wave that, I don't -- but, I mean -- I mean,

2    frankly, Mr. Mills, what I'm seeing here in this report is just

3    the same stuff that he's been going on with for a number of

4    years, at least 15 years or so, and even he, himself, says that

5    AV block is just no big deal.  I don't know.

6          I understand that he's got medical problems.  I

7    don't -- I'm not making light of that.  I feel sorry for him

8    that he has that.  I don't like to see anybody suffer with

9    cancer or any kind of heart problems.  And he does have heart

10   problems; there's no question about that.  I mean, I think

11   that's obvious.  But, I mean, is it to the extent that he can't

12   participate in trial; that's what I have to make, and I don't

13   really have anything from any doctor that would indicate that.

14          **THE WITNESS:**  Yes, sir.

15          **THE COURT:**  I'm not going to make my ruling right

16   now.  I'm going to think about it, and --

17          **THE WITNESS:**  May I step down?

18          **THE COURT:**  Sir?

19          **THE WITNESS:**  May I step down?

20          **THE COURT:**  Yes, sir.

21          I'm not going to make my ruling right now.  I'm going

22   to think about it and give it my consideration and try -- if --

23   whatever I do, I'll try to get something out that one side or

24   the other can take exception with.  I mean, I just don't know.

25   My -- my -- frankly, I don't know, Mr. Mills, when -- if -- if

1    the state is like you say with Dr. Niamatali, then there is

2    never going to be a time he can go to trial.  So, the

3    Government just ought to throw its case in and let him go on

4    again and wherever he wants to go -- I can't remember where he

5    wanted to go -- and do work for the people.  But I don't think

6    the Government's going to be that altruistic.  So --

7            **MR. MILLS:**  Well, I'll continue -- thank you for your

8    consideration, and Mr. Jackson and I, Mr. Russ, Ms. Kennedy

9    will all be in communication.

10           **THE COURT:**  Right.  Well, I -- and I -- I mean, I

11   don't -- I'm not -- Mr. Mills, I want you to understand.  I'm

12   not playing doctor here.  I'm just reading the reports.  And I

13   don't see it.  I mean, I'm just reading what the doctor says.

14   And it says this, says that.  And, I mean, I know enough to

15   know what syncope and ischemia is.  I think those are just

16   common, everyday terms that everybody knows.

17           **MR. MILLS:**  Not everyone.

18           **THE COURT:**  Well, 97 percent of the population

19   (indiscernible).

20           **MR. MILLS:**  All right.

21           **THE COURT:**  But, I mean, when you say you've got

22   ischemia, I think most people understand that, hey, that's

23   something not right, but -- you know.  And even -- I think the

24   doctor testified he does not have injury and does not have

25   infarction.  And those are all three different concepts.  And I

1  find that Mr. -- or Doctor -- has been quite frank in his

2  medical condition.

3          **MR. MILLS:**  I don't think he observes what I observe

4  when he is not -- when he's in kind of a fugue state.  But,

5  nevertheless, I think he has answered objectively as best he

6  can, and I appreciate your letting us put this on.

7          **THE COURT:**  And, like I said, I feel sorry for him.

8  I don't like to see -- I don't like to see any person, any

9  human being, suffer with any kind of a disease or condition.

10          **MR. MILLS:**  I understand, Judge.

11          **THE COURT:**  And, you know, I mean, the question I

12  have to make is, is he able competently to assist you in trial?

13  So, that's really what it comes down to.  And I don't have any

14  affidavits from any doctors who say that under no circumstances

15  can he not participate in the trial.  And I don't know if any

16  doctor would give that kind of an affidavit.

17          **MR. MILLS:**  Well, you have my testimony to weigh.

18          **THE COURT:**  Well, you just got on me for playing

19  doctor; you can't play doctor either.

20      **(Laughter)**

21          **MR. MILLS:**  Well, I was playing lawyer.

22          **THE COURT:**  Playing lawyer.  All right, sir.

23          **MR. MILLS:**  Thank you, your Honor.

24          **THE COURT:**  I thank you, Mr. Mills.

25          We'll stand in recess.  Thank you.

COURTROOM ATTENDANT: All rise.

(Proceeding was adjourned at 12:21 p.m.)


CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    July 21, 2016_


TONI HUDSON, TRANSCRIBER